**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No 26-CR-001-RAW |
| | ) | |
| BEAU DANIEL SHOLAR, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS AND RECOMMENDATION**

This matter comes before the Court on Defendant Beau Daniel Sholar's Opposed Motion to Suppress Fruits of an Unlawful Search (Docket No. 74) and Opposed Motion to Suppress Statements (Docket No. 75). On September 24, 2026, United States District Judge Ronald A. White, who presides over this case, referred the subject Motions to the undersigned Magistrate Judge for Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1). (Docket No. 76). On October 13, 2026, the undersigned Magistrate Judge conducted an evidentiary hearing on Defendant's Motions with counsel and Defendant present. The sole witness at the hearing was Oklahoma Highway Patrol Trooper David Couch, who is a Task Forse Officer with the Bureau of Alcohol Tabacco and Firearms ("ATF"). The Government admitted one exhibit marked "Exhibit 38," which is an audio interview of Defendant at the scene of the fire inside a law enforcement vehicle. Defense counsel admitted three exhibits. "Exhibit 1" is an email chain from Defendant to the Muskogee Police Department which began on December 12, 2025. "Exhibit 3" is a thirty-three second snippet of body-worn camera footage showing what appears to be a firefighter entering a home and taking pictures after a fire has been extinguished. "Exhibit 4" is a is a forty-six second snippet of body-worn camera footage showing Defendant being removed from his vehicle at the

scene of the fire and being placed in handcuffs.

## I. Background

On December 15, 2025, the Muskogee Fire Department responded to a call of a structural fire at a residence in Muskogee, which they extinguished. Testimony established that the Fire Marshals contacted the ATF regarding some possible explosive devices in the wall of the residence. Testimony also established that while fire personnel were still at the residence, Defendant arrived at the scene. Law enforcement officers drew firearms, approached Defendant's vehicle and placed him in handcuffs. Defendant was subsequently placed inside a law enforcement vehicle where he was read his *Miranda* rights and interviewed by Trooper Couch and ATF agent Meredith. Defendant consented to searching the house after he was read his *Miranda* rights. However, evidence at the hearing established only that the Fire Marshals located the explosive devices once the fire was extinguished. There was no evidence showing the length of time between extinguishing the fire and locating the explosive devices by the Fire Marshals, nor was there any evidence presented as to whether or not the Fire Marshals were present while the fire was actively being extinguished. Finally, there was scant evidence presented as to the purpose of the Fire Marshals' search (cause or evidence gathering), just that it was part of a "post fire investigation." The ATF agent simply entered the residence and the Fire Marshals pointed out the explosive devices in the wall. No search warrants were ever obtained.

## II. Analysis

### A. The Search of the Residence and Defendant's Consent.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A search generally requires a warrant supported by probable cause to be considered

reasonable. *Riley v. California,* 573 U.S. 373, 382 (2014); *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000). Without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley,* 573 U.S. at 382 (citation omitted). One such exception to the warrant and probable cause requirements is "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Although "a search authorized by consent is wholly valid," the Government bears the burden of establishing that the consent was "freely and voluntarily given." *Id*. at 222.

Defendant argues that the Fire Department and ATF searched his home without a warrant in violation of his Fourth Amendment right to be free from unlawful searches and seizures. Specifically, Defendant argues that he did not give consent prior to the search of his home. Defendant further argues that, even if he had consented to the search, it was not freely and voluntarily given because prior to giving consent, it was known to the interviewing officers that Mr. Sholar: (i) was a psychiatric patient, (ii) was not taking his medications, (iii) had been the subject of a recent wellness check where he was forcibly medicated, and (iv) had bizarre ideas that were not consistent with reality including that the agents were sent by God and that the freemasons built tunnels under his home to spy on him. Thus, Defendant asserts the officers knew that his consent was not "the product of a rational intellect and free will" and made with a 'mental awareness so that the act of consent was that of one who knew what he was doing.'" *United States v. Quezada-Lara*, 2018 WL 3621027, at *10 (D.N.M. July 30, 2018) (quoting *United States v. Sims,* 428 F.3d 945, 953) (10th Cir. 2005).

The Government relies on *Brigham City, Utah v. Stuart,* 547 US 398 (2006) to justify the Fire Marshals' and ATF's warrantless search of Mr. Sholar's residence. In *Brigham City, Utah v.*

*Stuart,* law enforcement officers responded to a noise complaint in the early hours of the morning. "As they approached the house, they could hear from within an altercation occurring, some kind of fight." *Id.* at 403. The officers followed the noise to back of the house and observed through the kitchen window, a juvenile, who was being held back by several adults, strike one of the adults in the face. *Id.* The Court held that it was "plainly reasonable" for the law enforcement officers to enter the house and quell the violence, because they had "an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* Although *Brigham City* did not involve a fire, the Court noted it has held "that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause." *Id.* (citing *Michigan v. Tyler,* 436 U.S. 499, 509 (1978). Specifically, the Court in *Tyler* held that a burning building creates an exigency that justifies a warrantless entry by fire officials to fight the blaze and that once in the building, officials need no warrant to remain for "a reasonable time to investigate the cause of the blaze after is has been extinguished." *Tyler,* 436 U.S., at 510. However, "additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id.* at 511.

Here, the Court simply has no evidence regarding the time of Fire Marshals' entry, whether that entry was during or after the fire, or how long their investigation lasted. The ATF agent testified that the Fire Marshals' entry was for the "post fire investigation." However, there was no testimony as to whether there was any break in time between the initial discovery of the explosive devices and the presence of the Fire Marshals, whether the Fire Marshals' presence was continuous or whether they left and then returned. Given this record before the Court, the undersigned Magistrate Judge cannot find the Government has met its burden to justify a warrantless search.

The Government next contends that Defendant consented to the search of his residence. However, according to the taped interview, Defendant's consent occurred after the Fire Marshals called ATF and after the ATF agent had already entered the residence and observed the explosive devices. This is further supported by the fact that the ATF agent discussed where the explosive devices were located within the home with the Defendant. Thus, Defendant's consent to search his home was not given until the officials had already conducted their search.

The Tenth Circuit has held that voluntary consent can purge the taint of an unlawful search. *United States v. Carson*, 793 F.2d 1141, 1150–52 (10th Cir. 1986). In *Carson*, the defendant was hunting doves, but possession of doves was illegal pursuant to migratory bird treaties. While the defendant was out hunting, a police officer looked inside a five-gallon pail in the defendant's truck and discovered illegally obtained doves. The defendant was unaware of this initial unlawful search. Without telling the defendant of the prior illegal search, the police officer later asked the defendant for consent to search his truck, which he provided. The Tenth Circuit held that the defendant's subsequent consent was voluntary, and the fact that the police officer requested such consent only because of the information he obtained in the initial illegal search did not make it any less voluntary. *Id.* at 1147. The *Carson* Court ultimately held that "voluntary consent, as defined for Fourth Amendment purposes, is an intervening act free of police exploitation of the primary illegality and is sufficiently distinguishable from the primary illegality to purge the evidence of the primary taint." *Id.* at 1147-48. Because Defendant's consent to search his home was not given until the officials had already conducted their search, as set forth above, the undersigned Magistrate Judge must determine whether such consent was voluntary.

Under the Fourth Amendment, consent to a search must be voluntary in fact and free of coercion under the totality of the circumstances. *Schneckloth,* 412 U.S. at 248-49. The mental condition and capacity of the consenting party is a relevant consideration in determining whether a consent to a search is voluntary within the totality of the circumstances. *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) (citations omitted). However, "a person is not precluded from consenting to a warrantless search simply because he or she suffers from a mental disease." *Quezada-Lara,* 2018 WL 3621027, at *8 (quoting *Unitd States v. Richards,* 741 F.3d 843, 849 (7th Cir. 2014). The Tenth Circuit has set out a two-tiered standard for determining whether the Government has sustained the burden of showing that consent to a search was voluntary under *Schneckloth.* The Government must demonstrate with "clear and positive testimony" the consent was "unequivocal and specific" and "freely and intelligently given." *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991). It must also prove the consent was given without duress or coercion, express or implied. *Id.*

During the interview, Defendant told the agents he was 100% disabled due to a mental disability, he had been hearing voices, that he was not taking his medication and that he had to be forced to take his medication the day before the fire. Defendant further indicated that he had recently lost custody of his children because he would not take his medication. Defendant stated that he believed people were watching him and listening to him. Defendant also stated a coven of freemasons were molesting children and built tunnels under his home to spy on him. Additionally, Defense counsel introduced an email Defendant sent to law enforcement on December 12, 2025, before the fire (Defendant's Exhibit 1), informing them of "visions about the secret coven easter star and 33rd free mason." Defendant indicated they were trying to kill him.

Thirty minutes into the interview, consent was requested and given after an agent advised Defendant of a tube in the wall in the garage that they wanted to recover, thus informing Defendant that a search had already occurred. The interview was conducted by two agents inside an automobile. It appears Defendant was handcuffed the entire time as the chains can be heard throughout the recorded interview. Defendant was advised that he was "in custody."

Under these circumstances, the undersigned Magistrate Judge cannot find Defendant's consent was voluntary and free of coercion given Defendant's blatant and serious mental health issues and the fact that he was made aware the ATF had already conducted their search.

**B. Defendant's *Miranda* waiver.**

"[A] suspect may waive [their] Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly, and intelligently.'" *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). To be voluntary, the relinquishment must be the "product of a free and deliberate choice rather than intimidation, coercion, or deception. *Id.* at 573 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). Simply put, the suspect must comprehend the meaning of the words in the warning. *Id.* at 574. The "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* Rather, the suspect need only be made aware of their options: (1) they "may choose not to talk to law enforcement officers," (2) "talk only with counsel present, or (3) "discontinue talking at any time." *Id.* "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Smith v. Mullin*, 379 F.3d 919, 932–33 (10th Cir. 2004).

Defendant asserts that his *Miranda* waiver was not knowingly made because he was in a psychotic state during the interview and believed that he was speaking to persons sent by God to assist him in irradicating evil when he waived his right to an attorney and to remain silent. Defendant attributes this psychotic state to his failure to take his antipsychotic medications and states that this psychotic episode prevented him from distinguishing between fantasy and reality.

The custodial interview begins with Defendant stating at :00:03 seconds, “God told me he would have someone here.” After being told the identity of the agents and that he was not being arrested, Defendant states at 00:46 seconds, ”God said I would have someone here on my side.” One of the agents then says, “obviously you are in custody.” Thereafter, Defendant is read his *Miranda* rights and he indicated that he understood them. Defendant immediately informs the agents of his mental health issues. However, throughout the interview, Defendant is clearly responsive to their questions and he clearly understands his situation. He acknowledges that he may be going to jail and that he will not see his children for a long time. He asks what the potential punishment is. Notably, when the agent tells Defendant that he is going to read something to him at the outset of the interview, Defendant immediately responds by asking, “My *Miranda* rights?” The agent says yes and Defendant then asks, “Am I being arrested?”

Defendant analogizes his psychotic state resulting from medication noncompliance to the situation in *United States v. Burson*, 531 F.3d 1254, 1256-57 (10th Cir. 2008), where the Defendant claimed he was too intoxicated and exhausted to knowingly and intelligently waive his *Miranda* rights. The Tenth Circuit held that a suspect must be not merely intoxicated but “impaired to a substantial degree” by drugs to overcome his ability to knowingly and intelligently waive his Fifth Amendment rights under *Miranda*. *Id*. at 1258. Although *Burson* involved an impairment from the

use of illegal drugs, and the Defendant in this case asserts he was impaired from the failure to take his antipsychotic medication, the analysis remains the same. There must be a substantial impairment affecting awareness of his rights and the consequences of abandoning them. *Burson* at 1258–61.

While the interview clearly shows Defendant is suffering from a mental health issue, the interview also reveals Defendant understands he is in trouble. He understands he may go to jail, he understands he will not see his children, and he provides details as to the items in the house. He understands the questions being asked and is clear and responsive in his answers, although some of his explanations are indicative of a mental health issue. Nonetheless, under the totality of the circumstances surrounding the interview, Defendant's mental health issue did not substantially impair his ability to knowingly and intelligently waive his Fifth Amendment rights under *Miranda*.[1]

**III. Conclusion**

Because the Government has not carried its burden to show the warrantless search of Defendant's home was justified, the undersigned Magistrate Judge RECOMMENDS Defendant's Opposed Motion to Suppress Fruits of an Unlawful Search (Docket No. 74) be GRANTED and that any evidence seized or obtained from the inventory search of the home or phone, be SUPPRESSED.

1 Consent to search and waiver of *Miranda* rights are not mutually exclusive. A person can give consent to a search, waive *Miranda* rights, do both, or do neither. They involve different constitutional protections and different legal tests. *See Schneckloth*, 412 U.S. at 235–48.

Further, because the evidence shows the Defendant's *Miranda* waiver was knowingly and intelligently given the undersigned Magistrate Judge RECOMMENDS Defendant's Opposed Motion to Suppress Statements (Docket No. 75) be DENIED.

Any objections to these Findings and Recommendations must be filed no later than October 20, 2026 and any response must be filed no later than October 22, 2026. Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

IT IS SO ORDERED this 16th day of October, 2026.

D. EDWARD SNOW
UNITED STATES MAGISTRATE JUDGE